and Beverly Warren case number 17-12589 and we'll just wait until the courtroom Good morning. May it please the court, my name is Cody Short. I'm here along with my co-counsel Lisa Borden on behalf of Appellant Mr. Marbury in this case. This case is about a prison inmate who, despite multiple attempts to request protection from prison security, was ultimately stabbed in an entirely preventable attack. Following the notification of a specific threat to his person to Officer Beverly Warren, Appellant was told that if the person who was out to get him had a knife that he better go get one to defend himself. Let me ask you, you throughout the brief and just now said specific threat against his person. He was told that there was a threat but no threat was identified. There is no specific threat. We don't know who made the threat. We don't know what the nature of the threat was. So, how are you calling this a specific threat? Sure, I think that we classify the threat as specific in part because Officer Warren clearly thought that the threat was so specific that she should respond that Appellant needed to go get his own knife. He made a clear request for protection and fear for his safety and even his life in this instance. So, you're saying this threat becomes specific simply because of the response? I think that the response definitely indicates that the threat was specific and the threat was identified and characterized by the prison official as something that they needed to respond to. Absolutely, the distinction between specific and general and the prison population cases is enormously important because unfortunately there's one can say there's a general threat in the general prison population and most of these certainly the state court penal institutions. So, the insistence upon a specific threat that it be a more immediate or demonstrable reflects that reality in order to run us to an actionable event. Sure, absolutely it does in the case to sort of bear that out. I think this case is very similar to Rodriguez which the court has asked about previously in that Appellant Marbury does not identify another inmate by name which is not required by the cases within this circuit or really within any other circuit. In the Rodriguez case, Mr. Rodriguez made a written request to the warden at his institution saying I have a problem with another inmate in this compound. I want you to tell me my status here where I am. I submitted a request for protection. I want to know whether you're going to give me a transfer. Mr. Rodriguez doesn't identify any particular risk factors in that there's been any sort of gang violence and there's presence of weapons within his cell block. He does not identify another inmate. He does not identify another group of inmates within a gang or within any really other subset of the prison population. My position would be that it is this case and Mr. Marbury's request is very similar to the request in Rodriguez where this court found that summary judgment was improper because there's a factual question whether or not that subjective component of the standard has been met. But in the Rodriguez case, it's at least arguable that the inmate was aware of I have a specific problem with a specific inmate. So, it's clear from the letter that the inmate knows who that is and may not have disclosed it in the letter. In this case, it's not at all clear that Mr. Marbury has any idea of the nature of the threat, who it is, because he's heard from somebody that someone might be directing a threat to him. How is that not more removed such that it's no longer specific? I think the general nature of prison complaints and maybe the stigma around people who complain about other inmates within prisons needs to be considered fairly closely here. Mr. Marbury, while he did not identify someone by name and states that he was sort of told this information secondhand, it's not very likely that he's going to actually identify someone by name in a written complaint. Didn't Mr. Marbury, though, actually say that a friend had warned him that another inmate was out to harm him and this was also in conjunction with having witnessed himself at least 15 stabbings in the few months that he had been there, including three, I guess, three involving guards and there being absolutely nothing done to prevent any of that. Yes, absolutely. I think that's something that needs to be considered in this case is that not only do we have the one written complaint, which appellant characterizes as being specific enough, we also have multiple written complaints and multiple verbal complaints to not only Warden Estes but Officer Warren in this case. And wasn't he also asked to be placed in lockup just until he could be transferred or otherwise or the threat passed? Didn't he ask specifically to go to lockup? Yes, Your Honor. He asked for some sort of temporary confinement that would protect his safety and I think that goes to reasonableness of action by the prison officials in this case. And it was four days later that he was stabbed? Absolutely. How difficult would it have been to place him in a cell for a week and investigate and let things cool off? And that's absolutely not been done here. Absolutely nothing was done here and that's maybe another distinction between... Isn't it even worse than nothing? I mean, according to... And of course, we have to construe the allegations in the light most favorable to your client and accept them as true. So whether this happened or not, I don't know. But assuming it happened, that Officer Warren responded by saying that she didn't care about the threat and do you really think I'm going to act on your request after you filed complaints and requests against me? And then laughed and said, you don't have a shank? If not, you need to get one because you're not going to lock up. There's no cell available. So it seems to me like you've got a problem. Yes, absolutely. It's not only just ignorance to his complaint. It's this sort of brash response that, you know, we're not going to do anything for you and you better go defend yourself. This case is very similar to Rodriguez in that regard and there was a hearing where... Slightly different because there was a hearing, but there was an opportunity for Rodriguez to explain sort of his concerns. And he was told that if he didn't go back into prison population as ordered by the guards, that he would be written up for noncompliance with prison rules and would be reprimanded in that way. So there's almost this brash response in that we don't necessarily... We're not only not doing something for you, but, you know, you're out to... Counselor, you bring really two, as I understand your argument, two different types of risk at issue here. One is the general threat that's posed by Tumar, by the inmate of violence in his cell block. And the other is a relatively more specific and closer question of the threat, more specific threat. That is when he testified that a friend told him that they're after you. So there are two things that are there. The first one, I don't think you really got off the ground with, and the magistrate judge didn't in his recommendation, too. The second one is a close one. Can you give us any more detail? Would the record reflect any more detail about the second threat other than it comes across as being a bit vague? You defended on the vagueness on the basis that, well, we're not going to be inclined to wrap because that would be worse, but it's closing the specific thing. The second threat being the April 19th written request to... That's the closest thing you come to a specific threat. Sure. I think, again, going back to Officer Warren's response that Appellant Marbury needed to get his own knife, that information is included in the written request to Warden Estes. Let me ask you this related to the question that Judge Higginbotham is asking you. Was there any investigation at all of the claim that he made, the concern that he raised about another inmate telling him that he was going to be harmed? In other words, did he not cooperate with some kind of investigation or follow-up, or was there any follow-up? There's no evidence in the record that indicates any investigation was performed. In fact, there's evidence to the contrary. Warden Estes' affidavit states that all written complaints come to his office and then he delegates investigation out to a captain or a lower-level prison official. In this case, he says that that would have been Captain Carla Graham. He does not reference the April 19th written complaint from Mr. Marbury in his affidavit. Captain Carla Graham also submits an affidavit, which is in the record, where she states that she was not asked to investigate any allegations made by Mr. Marbury and at no point did she actually investigate any complaints made by Mr. Marbury. He also made some other requests for transfer apart from a threat. He wanted to be in a more sociable environment. He wanted to be with inmates closer to his age, but even on that one, he tacked on whether fewer incidents and stabbings and so forth. So, the prison is looking at somebody that wants to move from that cell block and then he comes later comes back with a more relatively more specific threat itself. I would submit that the previous notifications of violence in cell block and gang members being in that unit should have placed prison officials on some sort of heightened awareness to some threat that was made afterwards, especially when there's more specific facts to back up that complaint. He's saying, hey, there's been all these stabbings and I'm going to be stabbed and there's literally nothing done, which is absolutely what led to his attack in this case. Thank you, Mr. Short. You have reserved five minutes for rebuttal. Mr. LaCour. Thank you, Your Honors. May it please the Court, Edmund LaCour on behalf of Officer Beverly Warren and Warden Duane Estes. Judge Branch, as you pointed out, this is a specific threat case without a specific threat. On April 18, 2016, Mitchell Marbury purportedly told Beverly Warren that an unidentified person had heard from another unidentified person that someone wanted to harm the plaintiff. But let me ask you something about that. I mean, if under this reasoning, it would seem that the natural conclusion of what you're suggesting is the only way that the prison has any obligation to investigate or to take any action when a threat arises is if the inmate can identify with specificity, almost like a clue, who's going to do it, where they're going to do it, when it's going to happen. I mean, there is such a thing as knowing of a threat that is a real threat without being able to identify who specifically is going to do it. So my question to you is, what, if any, obligation does the prison have to investigate a claim of a real threat if the person making the claim cannot identify who the attacker is supposed to be? Your Honor, a couple of points to that. As this Court pointed out just three months ago in the Millage case, which we filed a 28-J with the Court on Friday, threats among inmates happen with some regularity. And a threat alone cannot be enough to show that an inmate is facing not merely some risk, but is facing a substantial risk of serious harm. So while perhaps they should have investigated and it was negligent not to, that doesn't mean that this rises to the level of cruel and unusual punishment. Except, and perhaps that could be true, perhaps that could be generally true, but we're talking about St. Clair Prison here. And we're talking about an inmate who allegedly responded to Mr. Marbury by laughing and acknowledging that he better get a shank because this is a realistic problem in this prison. And we're talking about a situation where Mr. Marbury himself alleges that there were at least 15 other stabbings within the few months that he had been there. So why is that, why does that not trigger some kind of an obligation on the part of the prison to do something more than laugh about it and suggest that he needs to make an illegal weapon, a shank, so he can defend himself? There's a lot packed in there so I'll try to take it all in course. I think at one point you're referencing what Judge Higginbotham was referencing, the sort of general allegation of violence claim that he's also presented next to his specific threat claim. We don't think that he has presented enough evidence in the sufficient frequency of violence that would make St. Clair based on this record, Your Honor. And I understand, I do want you to fully answer the question, but as long as we're on that point, part of the reason the record is the way it is is because he was not allowed to engage in discovery. And if he had engaged in discovery, perhaps he might find out about the DOJ report and the DOJ investigation, which found that there wasn't a deliberate indifference to the rights of the prisoners at prisons like St. Clair. I mean... The very first paragraph of the DOJ report says, we are not a tribunal authorized to lay down binding facts or conclusions of law. Of course not. I don't think this court would take judicial notice. But why doesn't that put them on notice? I mean, if that were in the record, and I agree, it's not in the record, but the reason it's not in the record is because he was not allowed to engage in discovery. If he had been allowed to engage in discovery, then why would that not be something that would put them on notice, especially if a prisoner comes and says, you know, there have been 15 stabbings. I've been subject to a threat that there's going to be harm to me in particular. Why would that not require the prison to do something more than laugh at him and tell him to make his own shank? Perhaps this court will consider that case on that record at some point. We don't have any argument coming from appellant who now has able appellate counsel that the district court abused his discretion when it didn't allow more discovery. That is not an issue in front of this court. We have the record that we have, and that record is sparse. And if this court were to grant, were to reverse based on that record, it is going to make it possible for any inmate in the 11th Circuit to force a transfer to a more sociable cell block or to a more sociable cell or to obtain a more sociable cellmate simply by making a vague allegation with no who, what, when, where, why. And of course, not every inmate is going to have to check every single one of those boxes, but context is key here. These prison officials deal with threats every day. They need to be able to determine which ones raise some risk of harm, like perhaps Mr. Marbury's might, and which suggest that there is a substantial risk of harm. If you look at Rodriguez, it provides a very helpful contrast with this case. The friend on the other side noted that there was this written statement from Mr. Rodriguez that was somewhat vague, but I'd like to just note just for the record that in the Rodriguez decision, when it addressed that particular written complaint, this is at page 619 and in note 15, so Rodriguez said in writing that he had, quote, a problem with another inmate in this compound and he wanted protection. This court said that alone probably would not suffice to create a genuine issue of fact about subjective knowledge, but what Rodriguez did have was additional context, crucial context. The why, because he had left the Latin Kings gang. The who, Latin Kings gang members. The when, when I'm released from administrative segregation back to the general population. All of that tipped the scale from his threat showing merely some risk to showing a substantial risk. This case is much more like Millage, where you had a lone complaint coming from Mr. Millage saying, my cellmate doesn't like me. He has threatened to, quote, F me up soon, close quote. The court still affirmed a grant of summary judgment for the defendants in that case. I mean, the court said, I'll quote from that, it's also quoted in our 28J, that the court said that it was unlike other specific threat case, including Rodriguez, which is expressly distinguished because, quote, officials knew only of a single threat offering no other risk factors present for prison officials to draw the inference that Mr. Millage faced a substantial risk of harm. Counselor, can I ask you one question about the framing of the pleadings themselves? Wouldn't Estes be sued in his official capacity or his individual capacity? And the same question with regard to Officer Warren. Your Honor, I'd have to double check that. I believe it's in the individual capacity. They were sued individually for money damages or not? I believe that's correct, Your Honor. Individuals? Yes, Your Honor. There wouldn't really be any grounds for any injunctive relief because Mr. Marbury is no longer housed at the St. Clair prison anyway. Go ahead. You've mentioned context and what your opposing counsel will say is what's crucial to the context is you have this prison official who says, well, I hope you better find yourself a shank. So does that show that the prison official, in fact, drew the inference that there was a substantial risk of harm? Do we get to sort of the second prong of the deliberate indifference standard where, one, you have to be aware of the facts from which the inference can be drawn and, in fact, number two, the prison official draws the inference. With that statement, are we at number two that the prison official has, in fact, drawn the inference that this inmate faced a substantial risk of harm? Your Honor, I don't think her response is evidence that she drew that inference by any means. First, point you to page 16 of the opening brief where appellants themselves recognized that she was joking. She made a joke. It may have been crass or ill-considered, but it's hardly evidence that she thought that this was just another. That was Mr. Marbury, again, complaining that he wanted to be in a more sociable cell block, and because his earlier complaints had not succeeded, he came up with a specific threat that lacked any specificity. Second, I mean, just consider if instead Mr. Marbury had come forward and said, well, someone here is being rude to me, and she had responded, well, you better get yourself a shank and deal with it yourself. Her ill-tempered response would not be evidence that she had some subjective knowledge that he was... Of course, her ill-tempered response in that case, if it hadn't occurred in the prison where there had been 15 stabbings in the last few months, I mean, I think you have to consider that in the context as well. Don't you have to consider that in the context about what she knew and what she meant and how things have to be drawn, inferences have to be drawn in favor of the non-moving party here? Erin, you said something I think raises a very important point. You said that these happened in the last few months. There's nothing in the record to reflect that. Well, it said it happened while he was there. Exactly, but there's nothing in the record that says when he got there. So we could be dealing with a matter of a couple of months. We could be dealing with a couple of years, and that is also crucial. So I'd point you to this court's decision from 2014 in Harrison v. Holman Prison, also in Alabama, was facing a similar sort of frequency of violence charge or general violence charge like the one that we are facing here. What the court did was they looked at the context in the record evidence. They noted that there are between 830 and 990 prisoners who were in Holman Prison during that relevant time period. They also noted that there was a relevant time period. It was three years, and then the court was able to evaluate what to 33 instances of violent attacks with weapons, and the court said that those 33 attacks looked at in context didn't come close to showing that Holman was the sort of place where violence and terror reign. That's the standard, and that it was merely a place where the evidence at most showed that it was a place where there was isolated instances of violence. Now, here we have evidence in the record that there were 15 stabbings, but we don't know when. We don't know anything about them. We don't know who committed them other than they may have been gang-related, and again, if we know what the prison population, is there any evidence in the record of the prison population here? Absolutely not, Your Honor, and so what we have here, Dan, if we're dealing with 15 stabbings over two months, that means something very different from 15 stabbings over two years, and we think that without that crucial context, this is not a case that could ever go to a jury, which is exactly why the magistrate judge and Judge Colon granted summary judgment for the defendants and why we think this case should be affirmed as well. Let me ask you about Lane v. Philbin, which is another one of our precedents. Why under that case, well, let me ask you to discuss that case. Are you familiar with the case? Yes, Your Honor. Okay. Why doesn't that case require a reversal here? First, I want to double-check that. I believe it might have been a motion-to-dismiss case, but more importantly, that was a case that, again, had the sort of context that we had in the Harrison case. You knew other relevant facts from which you could sort of judge the other allegations that had been made by the plaintiff, but here, knowing simply that there were 15 stabbings tells us nothing, really, as to whether this is a prison with isolated instances of violence or prison or violence and terror reign, and for that reason, I mean, it's completely insufficient on the summary judgment standard to get this thing to a jury. I am very much at a minimum, Your Honors, in qualifying you should apply here. This case is much closer to cases like Millage and to cases like Harrison v. Culver than it is to any case where this Court has found deliberate indifference. To hold otherwise would allow prisoners to force transfers anytime they want a more sociable cell block or cellmate, and importantly, as Judge Higginbotham, you alluded to earlier, to rule against defendants here would make it impossible for prison officials to exercise their professional judgment when they face these sorts of threats, which they face on a regular basis. For that reason, there's no clearly established law that requires that result, and we think this case should be affirmed. Let me ask you, why do you think Hale v. Tallapoosa County does not apply here? Your Honor, I have to look back at it, but I think, if I'm recalling correctly, it's another one of these cases where you have like a bullet point list of 10 or 11 factors that were actually shown in the record, as opposed to one factor that we have here. But you would like it to be one factor, right? But you've got 15 stabbings, you've got three to guards, I guess, you've got he's complaining about the gangs, just like has been complained about before, non-gang member violence, and he's got the specific threat as well. That is a helpful, you did raise one more issue I did want to clear up before I sat down. He asserts in his complaint that he alerted Warden Estes to the fact that there were a lot of gangs and he was not gang affiliated, and for that reason, he was scared. In the complaint, that's at page six of the complaint, he says, well, I wrote that in a letter to Mr. Estes on February 12th. If you actually look at the letter he wrote to Mr. Estes on February 12th, that's documentary 21, page 23. He doesn't make that same claim. He does say that there are gangs here. He doesn't say, however, that they are being particularly violent to non-gang affiliated. What does the record show about the gang membership in Harrison that the court recalls that 90% of the inmates were gang members? 90% are, and Rodriguez, we had evidence that Latin Kings held sufficient sway there that Mr. Rodriguez was going to be in particular trouble because he had left the gang, something they don't take kindly to. We just don't have evidence like that, and again, this was that summary judgment. Your Honor, your point about discovery, I mean, that's not a question that's before this court. Help me a little bit. What does the law in this circuit with regard to the presence or absence of a causal relationship between the incident and the underlying circumstance, present conditions? Your Honor, there's also been something that the magistrate judge seized on as well. I'm not seizing on it. I'm just wanting to comment on it. Thank you. Your Honor, I do think that is an important point, though, that there wasn't any sort of causal link between his allegations that there were a lot of gang members in that cell block or that he'd seen these stabbings. I understand that, but I wanted you to help me a little bit about what the case law is with regard to the necessity of a causal relationship or not. My sense is that that's to be shown from the failure to act versus some other factor. And let's go back to a point about, well, why didn't they investigate? Well, what were they exactly going to investigate? Someone said that someone said... Well, they could have asked him who the inmate was who told him that, and they could have followed up with that inmate. I mean, there's certainly something that could have been done. Maybe it would have come to no fruition. I don't know. But then I think your clients would be in a better position. But they did nothing. Well, they didn't do nothing. They laughed and suggested he make a shank. Your Honor, at the most, that shows that perhaps they were negligent and they could have followed up and asked another question. But what this Court looks to is whether what they were aware of and what was brought to their attention is enough itself to show that there was a substantial risk and not merely some risk. Of course, there was some risk. This Court has also recognized that in the jail setting, there's always going to be some risk. But what we have here is not a substantial risk. And if this Court were told that it is, it is going to make it impossible for prison officials across the Eleventh Circuit to do their jobs. We think this Court should affirm. Thank you, Mr. LaCour. So, I think that because I believe counsel made Millage sort of a focal point of his argument, I'd like to talk a little bit about Millage. So, in Millage, there is, first of all, the opinion includes very little factual information. There is one single threat in Millage. Here, we have multiple different complaints by Pell Marbury for his safety, not only generalized, but the more specific complaint that's made later. The complaint that is made to prison officials in Millage is that his cellmate will F him up. Well, that could literally mean anything and is not limited to physical violence. It could quite literally mean anything. That is not a I think we know what it means in prison. Sure. It has many, many potential meanings. But here, we have an inmate who has complained of stabbing violence, particularly. We have evidence that there's weapons, particularly shanks and knives, within the facility. And then he is stabbed. There's a very clear line as to what he's alleging is a danger to him and what he does. Millage also contains no reference to any other risk factors as pointed out in the opinion by the court. There's no mention of any gang violence within the cell block or the unit. There is no mention of any weapons or actual risk factors associated with the generalized threat that Millage made. Here, that's just not the case. As has been sort of poured over multiple times now, we have these 15 different incidences of stabbings. And that's just what he's... So the relief you seek ultimately should have been granted was to transfer. Is that correct? There was injunctive relief was sought, but there was also monetary damages. I understand that. But the damage is not going to help him. He goes back in the place where he's going to get stabbed. I assume that you're asking your fundamental complaint of their failure here was to transfer him to a, quote, safer place. I think that Appellant Marbury would have been satisfied with pretty much any action to at least... But he had asked earlier for a transfer to another place, which he thought was more... But his record shows what that is. I'm going back to the question of generalized complaints. Is there any place within the prison system, the record shows, that was a safer haven to which he could have been transferred? I don't know that his request is necessarily to be transferred to another facility so much as it was to be placed in a segregated holding area, whether that's just an individual cell where he could be held alone or put into a different cell. But I just want to question a little bit about what he was seeking a transfer. Now, he doesn't want to go into administrative segregation, I don't think. Well, Your Honor, I would, not to argue, but I would... Well, I'm not trying to argue with you. What did he ask for? In his request, he asked to be moved to a safer area. I don't think his request isn't specific. But he said a more sociable environment and to people my age and so forth. I assume there was a different part of the prison. I'm trying to get a picture of what the prison setup is. Is the general population of the safer areas where prisons can move to gain balance or not? Didn't he ask to go to lock up pending transfer? Right. That's generally what his request was. Not really having any information in the record as to the actual setup of the prison or different areas, it's difficult for me to say exactly where he wished he would have gone. Just to say that he wished that he would not have been left in the cell block where someone had threatened his life. So I think... And speaking about what's in the record, what are we supposed to make of the allegation about 15 stabbings when the record does not reflect the period of time over which this has happened, when the record does not reflect the prison population? How can we evaluate that? Related to that, if you don't mind, I came away, and I can't tell you why I thought this at the moment, but I will plan on going back, but maybe you could help me, with the idea that Mr. Marbury was transferred to St. Clair just before February of 2016, so in January of 2016. I don't know why I am thinking that, whether it's just something that I came away with, but there's nothing in the record, or whether there's something in the record about it, but related to what Judge Branch is asking you, can you help me out with that? I don't want to mislead the court. I'm not specifically aware of anything in the record that states exactly when he was placed at St. Clair. As for the temporal nature of the stabbings, I'm not sure that... One, there's also no evidence that these stabbings occurred over some elongated period of time, is the first thing I'd like to point out. Two, I'm not sure that I would place a huge emphasis on that factor. I think... But our case law has evaluated when there has been a complaint of the 33 or whatever number of stabbings, looking at the period of time over which this happened, looking at the prison population to determine how much of a threat that just alleging a certain number of stabbings presents. So what are we supposed to do with that in this case without that context? I just think that the number of stabbings is exceedingly high. As for the temporal nature of them, we don't really have any evidence as to whether or not they were a month apart, or whether or not they were extended out over a period of years. I just would emphasize the fact that they were so serious and were such a cause of concern that Appellant Marbury mentioned them multiple times in several different requests. It wasn't as if these requests were spread out over a period of time. The requests all referenced the stabbings and they are months, two months apart. So I don't know that I would... The requests were two months apart. The requests were two months apart. The stabbings, we don't know. But the fact that the requests were made kind of shows that, at least in my opinion, shows that they were on his mind and were of concern kind of throughout his time that he was making the requests. In the request to be moved to a, quote, more sociable living area, doesn't he say in the, quote, short time that I've been at St. Clair, I've witnessed gang activity and 15 stabbings in my area? I have that in ECF number 21 at page 15. I don't see reference to in the short time, to be completely honest with you, Your Honor. I just, I don't want to mislead the court on... No, I appreciate that. And, you know, for me to sit here and say that it had some sort of temporal requirement attached to it would... I don't want to mislead the court on that. So if I could sort of just wrap up. This is not a case of solely general violence. This is a case where you have a history, a background of general violence in the unit that Mr. Marbury was housed in. You had all these attacks that were occurring. You had Mr. Marbury making multiple complaints of these attacks. And then you have a specific threat. So there's a combination of the generalized threats and the specific threat made on April 19th, four days prior to his stabbing. And those things, when looked at in conjunction, should have placed the prison officials in this case on notice that there was a serious threat to his person. Thank you, counsel. Thank you. Are you okay, sir? Whatever y'all want to do. Either way. Are you okay? Do you want to take a short break? You look fine going forward, but if you want to take a break... Whatever y'all want to do. I'm okay. Thank you. Thank you. All righty, next we have...